November 5.
JUDGE CARR,
delivered his opinion.
This is an action of assumpsit on a charter party not under seal. The jury have found a special verdict, setting out the charter party, and stating various other facts, leaving the law to the Court. There is also an agreement of the parties making the bills of lading part of the record. The charter party is not drawn out at length, in the usual form, but considerably abridged. By it, the plaintiffs engage the brig Commerce, commanded by Dixon Brown, to take a cargo of tobacco and flour for the defendants, from Richmond to Cadiz direct, at 51. per hogshead, and 11s. 3d. per barrel, freight, with 5 per cent, prim-age; “the concerned understanding that twenty running days shall be allowed for unloading the vessel after she arrives at Cadiz, and the master gives notice to the consignee that he is ready to unload; and for every additional day’s detention, the shippers shall pay $50 demurrage, quarantine always excepted, provided it is enforced with such rigor as to prevent vessels from discharging and landing their cargoes, and not otherwise.” The jury also find, that in pursuance of the charter party, the plaintiffs shipped on board the said brig, 100 hogsheads of tobacco, and 750 barrels of flour, and addressed the ship and cargo to James C. Wardrop, at Cadiz, their agent and consignee: that the brig arrived in safety at Cadiz, on the 19th of January, 1810, and the captain immediately reported his arrival *to Hackley, acting consul of the United States, and agent for Wardrop, as to the flour, and notified him of his readiness to deliver the cargo according to the charter party: that according to-the course and usage of trade at Cadiz, vessels arriving with cargoes are anchored in the bay, which is spacious, and the cargoes are deliverable along-side to lighters sent by the agents or consignees; and it is not the duty of masters to land their cargoes: that Wardrop was absent from Cadiz when the vessel arrived, and did not return until July 1810: that Hackley sent on the letters to Wardrop, which the vessel brought, with the knowledge of the master; and in about ten daj’s, received instructions from Wardrop, relative to the tobacco part of the cargo, and undertook the agency as to it; of which he gave notice to Brown ; but he gave him no directions at any time, touching the tobacco, nor did the master apply for any such directions: that between the 19th of January, 1810, and the first of March, inclusive, Hackley received 741 barrels of the flour, and paid the freight thereon : that about the time of the arrival of the vessel, or a little after, there being war between Spain and France, a French army had invaded Spain and were marching towards Cadiz, a strong1 place of war open to the sea, its port and anchorage safe from sudden attacks from land, and the British then the allies of Spain, having command of the sea: that on the approach of the French, great numbers of the Spanish arm3r and other subjects, came to Cadiz; and all the lighters and boats usually employed in taking goods from the ships to the town, were subjected to impressment, and most of them were actually impressed by the government: that owing to this, many vessels remained unloaded in the harbour, from the 28th of January, 1810, (when the French were marching to, and threatening Cadiz,) to-the 7th of March following; it being with the greatest difficulty that boats and lighters could be procured, and when procured, they were constantly liable to be impressed : that the 100 hogsheads of tobacco and 9 barrels *of flour remained on board until the 7th of March, when by a violent gale of wind, and without any fault of master or mariners, the vessel was driven from her moorings upon a part of the neigbouring1 coast of Spain then in possession of the French, by whom the vessel and cargo-were burned : that when the brig arrived at Cadiz, there was no market for tobacco, nor was it the intention of Wardrop or Hackley to sell it there, unless for a price for which it would not sell, but to re-ship it and send it to England. The jury conclude b3’ finding for the' defendants, if the Court shall be of opinion, upon the facts found,, that the plaintiffs are not entitled to recover. If the. Court shall be of opinion, that the plaintiffs are entitled to recover for demurrage only, then they find for the plaintiffs $1050 with interest. If the Court shall be of opinion, that the plaintiffs ought to recover freight and primage only, they find for the plaintiffs $2209 64, *211 with interest. And if the Court shall be of opinion, that they ought to recover freight, primage and demurrage, they find for the plaintiffs, $3259 64, with interest. The Court decided, that the plaintiffs were entitled to freight, primage and demurrage, and rendered judgment accordingly ; from which the appeal is taken.
Cases of commercial and maritime law, are of very rare occurrence in this agricultural land. I have found but one case in all our books of Reports, which touches the question of freight; nor does that involve any of the points raised here. Indeed, I have been able to find no case in any book, deciding those points directly. I must therefore consider them pretty much on general principles.
It may perhaps conduce to clearness, to give a distinct and separate examination to the question of freight and demurrage.
1. As to freight. The vessel which undertakes to carry goods from one port to another for hire, has a duty to perform before she can claim her reward. That duty is the safe transportation of the goods to the destined port, *and their delivery there, to the shipper or his consignee. It is a general rule, therefore, that a plaintiff who sues for freight, must, to sustain his action, shew a carriage and delivery of the goods; but if the plaintiff can shew, that he has performed all the stipulations of his contract, so far as the defendant would permit; and that the carriage or delivery of the goods was prevented by the act or default of the shipper; he will be just as much entitled to his reward, as if the goods had been carried and delivered; and this, under the operation of a principle quite as well settled, as that which, in the first place, holds a part to the performance of that duty, for which he claims a reward. On this principle, it has been decided, that if goods are taken on board, and the ship has broken ground, and the shipper unload them, having changed his mind as to the adventure, freight is due. Beaw. lex mere. 130. So, if a ship is freighted to go to any port to load, and on her arrival the freighter or his agent will furnish no load, the master having waited the proper time, she is entitled to full freight. These are cases where the ship has been prevented from carriage of the goods, and is yet entitled to freight. The following shews, that the failure to deliver, if caused by the freighter, will not deprive the owner of his freight. A merchant insured his . goods to a port abroad, there to be landed. The factor,' after their arrival, sells the cargo aboard, without unlading the ship, and the buyer contracts for the freight of them to some other port; but, before the ship broke ground, she was, by some accident, destroyed. Held, that the property of the merchandize being changed, and freight contracted de novo, amounts to as much as if the goods had been landed, so as to give the ship a perfect claim for her first freight. The construction of charter parties should be liberal, agreeable to the real intention of the parties, and conformable to the usage of trade in general, and of the particular trade to which the contract relates. Abb. 203. The jury have found, that the master arrived safely at Cadiz with the goods: that he *'gave immediate notice of his arrival and readiness to deliver the cargo to Hackley, who was the agent for the flour, and the only agent, (the consignee being absent;) and they find also,’that according to the usage of trade at Cadiz, it is not the duty of the master to land the cargo, but of the consignee to send lighters along-side the vessel to receive it. Here then are all the facts found, which it was necessary for the owners to prove, in order to make out their claim to freight; the safe carriage, tne offer to deliver, and the usage of the port.
There is no imperfection, no uncertainty-in the verdict, thus far. The case for the plaintiffs being thus prima facie made out, we must look to the verdict for matter of defence; for, unless the finding state enough to destroy the plaintiffs’ case, there must (it seems to me) be a recovery.
It devolves on the defendants to shew that the failure to unload the vessel proceeded from no default of theirs. They have attempted this, first, by shewing from the charter party that they had the right to convert the vessel into a store-ship, and keep the goods on board as long as they chose to pay the demurrage. Secondly, by shewing from the circumstances of the case, that they could not get the lighters to take the cargo from the ship. Thirdly, that from the master’s having made no protest against the delay, it is evident that he assented to it.
1. As to the right of the defendants to convert the vessel into a store-ship. The claim is founded on that part of the contract, which says, “twenty running days shall be allowed for unloading the vessel, and for every additional day’s detention, the shippers shall pay $50 demurrage.”Without looking to the books or the usage* it would seem to me, that upon the face of the contract, and the reason of the thing* this pretension must be pronounced unfounded. The business of the ship was the carriage of goods for freight. The purpose of this contract was the transportation of the flour and tobacco to Cadiz, and their delivery at that port. The parties consider that the cargo may be *discharged in twenty days. They therefore give the shipper this term for that purpose. Can any one look at this charter party, and not see that it is a part of the contract that the ship shall be unloaded in twenty days? Ror what other possible purpose, could this term have been introduced into the contract? We cannot suppose that the parties meant nothing by it. But the shipper might fail in his undertaking. The vessel might not be unloaded within twenty days; and to secure himself in that event, the owner has it stipulated, that for every day’s detention afterwards, he shall receive $50 demurrage. Can we suppose that by this stipulation, intended for his own benefit merely, the owner meant to give to the shipper a right to detain the ship ad libitum; to convert her into a store-ship; to suspend the claim of freight for an indefinite space; and during the *212 •whole time of suspension, to throw upon the owner the risque of the cargo, so far as his freight was concerned? If there were no authorities upon tne subject, I could never believe this to be the contract of the parties. But the usages of trade, and the definition of demurrage given by all the books, contradict the idea. They tell us that “demurrage is an allowance made to the master of a ship by his freighters, for staying longer in a place than the time first appointed for his departure, or his staying at the delivering ports.” Beaw. lex. mere. 142. In Abbott on Shipping, also, p. 191, 192, it is said, “The merchant usually covenants to load and unload the ship, within a limited number of days, after she is ready to receive the cargo, and after arrival at the destined port. Frequently, also, it is stipulated that the ship shall, if required, wait a further time to load and unload, or to sail with convoy, for which the merchant covenants to pay a daily sum. This delay, and the payment to be made for it, are both called demur-rage. ” Upon reason and authority, therefore, this ground of defence fails.
2. The second ground of defence is, that the circumstances of the case put it out of the power of the shippers *to unload the vessel, and therefore that' they are in no default, and so not liable for freight. I am by no means satisfied, that if the finding of the jury supported this ground, it would be a good defence against the claim of freight, where the loss of the cargo (as in this case,) happened after the expiration of the lay days. The parties have made a positive contract; the owner to allow twenty days for unloading the vessel; and the shipper that he will unload her in twenty days. Suppose the ship arrived at her destined port; no impediment in the way; and that the shipper might unload her in two days. The master gives notice, and presses the immediate delivery of the cargo. The shipper may say,- “No: I will not unload you one hour sooner than the expiration of the twenty days;” and if after this, and within the twenty days, the cargo is lost, though by inevitable accident, the owner loses his freight. Why is this? Because by the contract the shipper had twenty days to unload. If, then, the law of the contract is equally binding on both parties, how is it that the shipper is not liable for the freight, after the twenty days, though he were prevented by uncontrollable circumstances from unloading? He has positively contracted to unload within that time, making no provision for accidents or circumstances. That he might bind himself in this manner, I suppose there can be no doubt; not that a party would be held to do an impossible thing; but surely the •owner and shipper might agree, the one that he would hold his claim for freight, subject to the accidents which might' happen within the twenty days; the other, that after the twenty days, the claim to freight should be complete, and he would take all subsequent risque.
In Hadley v. Clarke, &c. 8 Term Rep. 259, a ship had taken goods to carry from Liverpool to Leghorn. When she arrived at Falmouth, on her way, an embargo was laid, which continued two years. During all this time, the master kept the goods on board. At length, he returned to Liverpool, and the plaintiff received his goods, by agreement *that such receipt should not prejudice his action. He sued the owner for breach of his contract, in not carrying the goods, and recovered 2971. 18, in damages, that being the amount he had paid for insurance on the goods, The verdict was subject to the opinion of the Court on the case stated. The Court were unanimous in favor of the plaintiff. Justice Lawrence says, “It was incumbent on these defendants, when they entered into this contract, so specify the terms and conditions on which they would engage to carry the plaintiff’s goods to Leghorn. They accordingly did express the terms, and absolutely engaged to carry the goods, the dangers of the seas only excepted. That, therefore is the only excuse they can make for not performing the contract. If they intended that they should be excused for any other cause, they should have introduced such an exception into their contract; and he cites a case from Alleyn, 27.”
In Touteng v. Hubbard, 3 Bos. & Pull. 291, Lord Alvanley, delivering the opinion of the Court, approves of the doctrine in Hadley v. Clarke. He says, “The case of Paradine v. Jane, Alleyn, 27, which was cited by Mr. Justice Lawrence, in Hadley v. Clarke, appears to me to be founded on much good sense. The third resolution is, that were the law creates a duty or charge, and the party is disabled to perform it, without any act in him, and hath no remedy over, there the law will excuse him; but where a party, by his own- contract, creates a duty or charge upon himself, he is bound to make it good if he may, notwithstanding any accident by inevitable necessity; because he might have provided against it by his contract.”
Leer v. Yates, 3 Taunt. Rep. 386. Same v. Cowell, and Same v. Gorst. The plaintiff, in these causes, declared in assumpsit against each defendant, for detaining the ship Marianna, of which he was master, on demurrage, with certain goods on board, for a long time. Upon the trial it appeared, that the master of the vessel, which was a general ship, having a British license, had taken on board at Bourdeaux, *the goods consigned to the several defendants, and also the goods for many other consignees, and had signed and delivered to each of the shippers a bill of lading, whereby he acknowledged “the shipping on board the Marianna of the goods (describing them,) to be taken out in twenty days after arrival, or to pay 41. per day demurrage.” The Marianna arrived in the London docks on the 17th of June. Certain of the consignees choosing to have their goods bonded, the vessel could not, from the crowded state of the dock, make her delivery, until 46 days after the 20 days. Some of the goods of other shippers were over those of the defendants, so that the defendants’ goods could not be got at in the ordinary courts of delivering the ship, until those above them were removed. The *213 defendant Cowell had bonded his goods as early as the 22d of August, and had made frequent demands of them ; but they could not be delivered, because of the goods of others lhat were above them. Neither of the three defendants had paid, or offered to pay, the duties. The jury found against each defendant 1841. damages, being the amount of demurrage at 41. per day for 46 days. The Judge reserved liberty to the defendants to move to reduce the verdict. Lens Serjeant obtained rules to set the verdicts aside and enter nonsuits. He moved upon the ground that a general claim for demurrage arises only in the case, where the delay, whether caused by the act of the defendant or not, has been beneficial to, and occasioned in the service of the defendant. But here, it had arisen from the extent of the commerce of the country, co-operating with the law resricting the delivery of these goods to the London docks; a misfortune which fell with equal hardship on the plaintiff and the defendant, and could not render the defendant answerable for the consequences. Serjeants Sheppard and Best shewed cause. The plaintiff (they said) does not found this action upon any mis-fea sanee or nonfeasance of the defendant. The bill of lading contains evidence of a contract to pay demurrage, if the ship be detained beyond a certain *number of days, from what cause soever that detention may arise, and of the rate at which that demurrage is to be compensated. There is nothing illegal in making such a contract, and the Court cannot enquire into the prudence or imprudence of it. Ch. J. Mansfield delivered the opinion of the Court. He said, “It is impossible to decide these three very singular causes, without being struck with the enormous gain which the owner may get by this bill of lading, and which may possibly much exceed what in justice and conscience he ought to receive. This is a general ship. Thirty or forty persons may have goods on board, and for every' one of them the owner may have his 41. per day. I was struck very much with the argument, that it was not the fault of the defendant, but the fault of the plaintiff himself, that these goods could not be got out till the others which were above them were delivered. But it is not. in truth, the fault either of the plaintiff or defendant, that the goods could not be taken out. There can be only so many goods at the top of a vessel as the proper stowage of the goods will allow. Therefore, all the others must be at the bottom ; and as this is a general ship, and the goods do not all belong to one consignee, the goods of some of the consignees must be undermost. If this argument would avail, therefore, that the captain is not entitled to demurrage for the goods which were not uppermost, it would restrain the contract for demurrage to the few persons whose goods were at the top; but that construction would be contrary to the positive contract; for it is impossible to get out of this bill of lading, which, though it is a singular species of contract to bind a consignee, by an instrument signed not by himself, but by the captain; yet, as the consignors delivered the goods on board, under that bill, and the defendants accepted that bill of lading, it is binding on them ; and therefore this action may be sustained on the general, count for demurrage. Rule discharged.” I consider this case as deciding a principle very like that which I have advanced,
*1 have stated these ideas and cases, to shew the ground of my doubt, whether this defence, if sustained, would be good. But grant that it would be good; that if the defendants were prevented by the vis major, ice, storms, &c. from unloading, they would be excused.
Yet it must be admitted, that this being matter of defence, it devolved on them to prove that it was impossible to unload before the destruction of the vessel. Have the jury found this? So far from it, that, as it seems to me, they have found what amounts to the contrary. The vessel arrived at Cadiz on the 19th of January, 1810. The jury find that there was war between France and Spain; and that from the 28th of January, (ten days after the arrival of the ship,) to the 7th of March, (when she was lost,) there was the greatest difficulty in procuring lighters; because the French army being on their march, and threatening Cadiz, many Spanish soldiers and subjects flocked thither, and the lighters were all subjected to impressment, and most of them were impressed by the government. Now, when the jury say there was the greatest difficulty in getting lighters, they do not mean that it was impossible to get them. On the contrary, I understand them1 to mean that it was possible, though very difficult. They find other facts, which' go-strongly to shew, that with diligence and activity, there might have been a delivery of the cargo. For ten days after the arrival of the vessel, there was no difficulty, that we hear of, in getting lighters; for it was not until the 28th of January, that the government began to impress them, Of the 750 barrels of flour, 741 were delivered, leaving only 9, and those probably for the consumption of the crew. This shews what the consignee could do, where interest prompted. Flour, no doubt, sold high in a besieged city. Why was not the tobacco delivered also? In the first place, there was no agent at Cadiz, authorised to attend to it, for ten days after the ship arrived; and secondly, the jury find that there was no market for tobacco at Cadiz, and that neither Wardrop nor Hackley intended it should remain there,
* (as they could not get the price they asked;) but meant to send it to England. This throws a strong light upon the probable cause of the tobacco’s remaining on board. There was no stimulus to excite the activity of the shipper. On the contrary, it was best for him that it should remain in the ship; for, if landed, the French might take it. These are but inferences, to be sure, and would not be relied on as establishing any fact; yet they go strongly to corroborate what I consider the actual finding of the jury, that it was possible to have unloaded the vessel. This second ground of defence, therefore, seems to me as unsubstantial as the first.
3. The third is, that the master assented *214 to the delay in unloading, and that this assent binds the owners. We must look again to the special verdict to see how this position is sustained. The jury find “that when Hackley received the agency as to the tobacco, he gave notice of it to Brown, but he gave him no directions at any time, touching the tobacco, nor did Brown apply for any such directions.” This surely was no assent to the delay. The captain had given notice to Hackley of his readiness to deliver the cargo. He had no need of any directions from Hackley. He had nothing to do, until lighters should come along side for the tobacco; and he needed no directions to inform him, that whenever they should come, he must deliver it. But it is contended that his failure to protest against the delay, is. proof of. his assent. This seems to me a strange mode of treating a special verdict. The jury find no assent of the master. They say not one word about his having protested or not. We are forbidden to presume or infer any facts in special verdicts; and yet we are to say he assented.
But it is said that at least the failure to protest was evidence of assent: that the ■jury ought to have found the fact; and that on this ground, the verdict should be set aside, and the cause sent back for a more perfect finding. I cannot consider the subject ' in that light. For what object *was a protest necessary? The ' parties had entered into a written contract, regulating the duties of each; the master to carry the goods and report himself; the shipper to unlade them within twenty'days, and to pay $50 for every day’s detention afterwards. The master had given due notice of his arrival and readiness to deliver. This was all he had to do, until the lighters should come along side. Could his protest have given the owners any •new right? No; for the contract did not make it necessary to the claim of demur-rage, nor to hasten the unloading of the vessel. The shippers bound themselves to unload in twenty days after notice of arrival, (not after protest) and to pay the demurrage. Was the protest necessary to furnish evidence? This is sometimes the case, and then it is said to be received, only from necessity. Boyer v. Moore, 2 Dall. Rep. 196. But here, it could not- be wanting to prove any part of the plaintiffs’ case; for the jury have, without it, found the facts necessary to their recovery. Can it be said that a protest was necessary, simply to prove that the master did not assent to the delay? This would seem to be inverting the order of things. The defendants rely, in their defence, on the assent of the master, and they insist that the absence of evidence that he did not assent, is proof that he did assent. I think no protest was necessary; nor do I think there are any defects or uncertainties in the verdict, which should induce us to send the case back. Enough is found to shew that the owners have complied with their contract, and ought to have their hire, as there is nothing found to protect the defendants from their claim. That more is not found in favor of the defendants, we must conclude, is, because there was no evidence to justify the jury in finding more.
On this point of a venire de novo, I will say a few words more, from the high respect I feel for the opinions of my brethren who differ with me in this particular.
Witham v. Lewis, 1 Wils. Rep. 54, 55, “a venire facias de novo and a new trial are very different things, *though alike in some points. They agree in this; that a new trial takes place in both, and that the Court may or may not grant either. They differ in this; that the venire facias is the ancient proceeding of the common law, the new trial a modern invention to mitigate the severity of the proceeding by attaint. New trials are generally granted where a general verdict is found; a venire de novo,’upon a special verdict. The most material difference between them is, that a venire must be granted upon matter appearing upon the record; but a new trial may be granted upon things out of it; as, if the verdict be contrary to the evidence, or the Judge has given wrong instructions. But a venire can only be granted in one of two cases. 1. If it appear upon the face of the verdict, that it is so imperfect that no judgment can be given upon it. 2. Where it appears that the jury ought to' have found other facts differently. An example of the first, is the case of Chatie v. Harwell, a prosecution for selling wine by retail. Venire de novo, because of the imperfection of the verdict; the Act of Parliament having particularly mentioned retail measure, as quart, gallon, Sic. and the verdict only found that he sold wine by bottles, without taking notice of the measures in the Statute. As to the second head, where it appears on the record that the jury ought to have found otherwise; “in an action of trover, if the jury, in a special verdict, find that the plaintiff demanded goods of the defendant, and he refused to deliver tnem, a venire de novo ought to go ; because the jury have found only evidence of a conversion, instead of finding the conversion itself.” This is a,decision of high authority, being upon error from a judgment of the King’s Bench, and tried by all the Judges, Chancellor Hardwicke among them, and they were unanimous. The above is extracted from the opinion of.Ch. J. Willes, delivering the opinion of the Court.
Try our case by the rules here laid down as to a venire facias de novo. The verdict must be, first, so imperfect that no judgment can be given; or secondly, it must appear *on the record, that the jury had evidence before them sufficient to authorise them to find facts which they have not found.
1. Is there not enough found here to justify judgment for the plaintiffs; the safe carriage of the cargo to the port; notice of readiness to deliver; and the custom of the port, that it is the shipper’s duty to take the goods from the ship, not the duty of the master to land .them? Is not this enough to make out the plaintiffs’ claim, unless contradicted by some other finding, or something found to excuse the defendant? And is any such thing found?
2. What evidence is there in the finding, which shews that the jury ought to have found facts which they have not found? *215 They find, that all the boats and lighters were subject to impressment by the government, and most of them were impressed. Can we say from this, that it was impossible for the defendants to unload the vessel? Or that they have deduced the fact improperly, when they say that from this cause, it was “with the greatest difficulty,” that boats and lighters could be gotten? Again. The jury find, that the master did not apply to Hackley for directions as to the tobacco. Does this shew that they ought to have found that he assented to the delay? I cannot think so. They find no protest; and I agree, that we must take it there was none. Does this prove that they had evidence before them, which justified their finding the master’s assent to the delay? Clearly not; for the protest could have answered no purpose. Every thing was fixed by the contract, and the master had performed his part. If he did assent, it must have been by some positive word or deed, and this the defendants should have proved. The record gives us no vestige of such proof. I cannot therefore see that there is any ground for a venire de novo. I conclude that the plaintiffs ought to recover the freight.
As to the demurrage, the principles which I have attempted to elucidate, if they be correct, decide that point without difficulty. The contract binds the defendants to *pay the demurrage for every day after the expiration of the lay days. If they would be excused from this by proving that it was impossible to •unload within the twenty days, they have not proved it; the jury have not found it; and they remain bound according to the charter party.
I have said nothing of the primage. It follows the freight of course. Upon the whole, I am for affirming the judgment of the Court below.
JUDGE GREEN.
It is admitted by the counsel on both sides, that there is no precedent to be found in the books of maritime law, deciding whether freight is due or not, when the vessel and cargo have safely reached the destined port, the stipulated lay days for •unloading, have expired before the vessel is unloaded and discharged, and the cargo afterwards lost by the perils of the sea or other inevitable accident; and that this question must be determined upon general principles.
On the part of the appellants it is insisted, that it is a general rule that freight Is not due until the goods are delivered to the consignee, at the port of delivery. And this is true, when there is a stipulation to deliver, upon a principle of universa,! law, applicable to all contracts, that one who stipulates to do any thing for a reward, cannot be entitled to the stipulated compensation, until the thing is done, for the doing of which the reward is to be paid; so that, if the performance of the thing stipulated, is prevented by any means, without the default of the other party, no compensation is due. It is however a principle as universal as that above stated, that if the party, who is to do something as a condition precedent to the compensation to be paid for the doing of it, is ready, able, and willing to do it according to his contract, arid offers to do it, and the performance is prevented by the act or default of the other party, the party so offering to perform has the same *'rights, as if he had actually performed his undertaking. Thus; “If goods are fully laden on board, and the ship hath broke ground, and the merchant, on consideration, determine again to unload them and not to prosecute the adventure, by the maritime law the freight is due.” Beaw. Rex Merc. 130. So, if a ship is freighted to go to any place to load, and on arrival there the factor cannot, or will not, put any thing on board her after the master has staid the days agreed upon by the charter party, and made his regular protests, he shall be paid, empty or full. Ibid. 131. So, if a ship is freighted out and home, and after having delivered her cargo at the place agreed on, there are no goods provided for her re-lading ; the master must stay the days agreed on by the charter party, and make his regular protest for his freighter’s noncompliance; who will, in that case, be obliged to pay him, empty or full; though, should the master not wait the time stipulated, or omit to make his protest, he will lose his freight. Ibid. 134. And upon this principle the case from Molloy, 243, cited in 16 Vin. 412, proceeded: “A merchant insured his goods to a port abroad, and there to be landed. The factor, after the arrival of the ship, sells the cargo aboard without ever unloading the ship; and the buyer of the goods contracts for the freight of them to some other port. But, before the ship breaks ground, she is, by some accident, destroyed. In this case, the assured and buyer are left without remedy; for, the property of the merchandize being changed, and freight contracted de novo, the same doth amount to as much as if the goods had been landed.”
In the argument, some exceptions were mentioned to the general rule, that a delivery of the goods is necessary to entitle the ship to freight, unless the delivery is prevented by the default of the freighter. One of these cases is founded on an ordinance of Rewis the 14th, mentioned by Valin, authorising a demand for freight when the goods are carried to the destined port, and prohibited to be landed by the laws of the country. Another is the case of *capture by a belligerent, and the separation of the ship and cargo by the unlivery of the latter, and both ship and cargo released. In this case the English Court of Admiralty has allowed freight. These cases have no application to the case at bar; and whether they ought to be received as law here, it is unnecessary to determine. They are exceptions to a general rule, founded upon particular reasons applicable to those particular cases; and the exception proves the general rule.
Ret us apply the general principles above stated, to the case at bar. The appellees contend, that the terms of the charter party did not bind them to deliver the cargo at the port of Cadiz, but only to carry it there. The contract must be reasonably I construed. The nature of the transaction *216 indicates irresistibly, that the sole purpose of employing the vessel, was to deliver her cargo at Cadiz, or any other port, to which she might be ordered, in the event provided for in the agreement. It surely could not be said, that the owners had earned their freight by carrying the cargo to the port of Cadiz, giving notice that it was there, refusing to deliver it, and bringing it back immediately. The days allowed for unloading, decisively prove, that she was there to be unloaded, and the goods delivered to the shippers or their consignee or assigns. The mode of delivery, whether to lighters along-side the ship furnished by the consignee, or on the wharf, or at the ware-house, depended upon the mercantile custom at the city of Cadiz; and according to this custom, as found by the jury, the consignee was bound to furnish lighters along-side the ship; and a safe delivery to them would have discharged the owners of the ship from any further care of responsibility for the goods. The construction of charter parties must be liberal, agreeable to the intention of the parties, the usage of trade in general, and of the particular trade to which the contract relates. Abbott on Shipping, 203, 246. The manner of delivering the goods, and consequently, the period when the responsibility of the master and owner *will cease, depends upon the custom •of particular places, and the usage of particular trades. Abbott on Shipping, 246 & sequ. The general rule, therefore, applies to this case. The vessel and cargo arrived at the port of Cadiz in safety. The master gave immediate notice of his arrival and readiness to deliver the cargo. This was all that he was bound to do at any time; and certainly he could do no more, until the expiration of the stipulated lay days. The lighters were not furnished by the consignee or his agent to receive that part of the cargo which was finally lost, either within the agreed lay days or after; and upon the principles before stated, the defendants were bound to pay freight and primage according to their contract, unless they were under no obligation to receive the cargo until they chose to receive it; or unless they were prevented from receiving it, by circumstances which made it impossible for them to unload the vessel before she was lost.
The appellants contend, that by the terms of the charter party, they were under no obligation to unload the goods until they chose to do so; and that they had a right to detain the vessel as long as they pleased, paying the stipulated demurrage; and therefore, the non-delivery of the cargo cannot be attributable to any culpable laches on their part, of which the appellees can rightfully complain. They argue, that the lay days were compensated for in the freight to be paid upon the delivery of the cargo; that any additional delay was compensated for by the stipulated demurrage; and that so long as they were willing to pay the demurrage, the master was bound to suspend the delivery of the cargo, retaining it on board the vessel, at the peril of losing the freight if the cargo should be lost and never delivered.
The best examination and consideration which I have been enabled to give to the subject, have led me to a different conclusion. The very contract to carry for freight, implies in its nature, on the one hand, that the master shall submit to any delay arising from necessity, and not from *the default of the merchant; and on the other, that the merchant shall discharge the vessel with all the dispatch possible, under existing circumstances : that, if there were no stipulation for lay days, and the landing of the cargo were prevented for any length of time by an uncontrollable necessity, the vis major, such as storms, ice, or the orders of the government, the master would not only be entitled to no damages for the delay, but if the cargo were in the mean time lost, he would not be entitled to freight, any more than if it had been lost in the midst of the voyage; whilst if the delivery of the cargo were delayed by the default of the merchant, and without necessity, the master would not only be entitled to damages for such unnecessary delay, but' to the stipulated freight, even if the cargo were lost in consequence of such delay. He might land the cargo, and store it at the expense of the merchant, retaining a lien upon it for his freight. Without a stipulation as to the time to be allowed for unloading and receiving the cargo, each case might give occasion to a contest between the parties, whether the merchant had used due diligence in discharging the ship, and whether he was liable for damages for delay in unloading ; and in case of the loss of the cargo by such delay, whether, the captain was entitled to freight. To avoid such controversies, charter parties usually contain a stipulation for lay days, prescribing a time within which, if the ship is discharged, no laches can be imputed to the merchant, and if the cargo is lost, no damages nor freight claimed. But, this stipulation has no further effect upon the obligations of the parties, resulting as before said, from the nature of the contract, so-that if, by the default of the merchant, the vessel were not discharged within the stipulated lay days, the parties would be in the same situation as to all subsequent delay, as if there had been no lay days agreed upon. If by the merchant’s default, the vessel was not discharged within the lay days, the captain would be entitled to-damages and freight, and might land the cargo as aforesaid. *But, if the unloading were, during the lay days, prevented by an irresistible necessity, and that impediment continued after the expiration of the lay days, the master would be bound to wait until the impediment was removed, if it were in its nature temporary ; and until the vessel, with due diligence, could be unloaded, without any right to damages for the delay, beyond the lay days. In case of loss of the cargo, during the impediment, or before it could be unloaded after the impediment removed, he would lose his freight. This, it seems to me, would be the effect of a contract containing no stipulation for demurrage after the expiration of the lay days.
In such cases, two questions would arise; *217 first, whether the delay beyond the lay days, proceeded from the default of the merchant; and if so, secondly, what was the amount of the damage sustained by the master, for which the merchant would be responsible.
The first of those questions is incapable, in its nature, of being solved by any previous stipulation between the parties. The second may be adjusted by agreement between the parties, before as well as after it arises. Accordingly, there is usually found in every charter party, a stipulation to pay demurrage for delay; sometimes after the expiration of the lay days, sometimes without any stipulation as to lay days; as is the form of a charter party given by Beawes in his Bex Mercatoria, page 135. The natural office of a stipulation to pay an ascertained sum for demurrage, seems to be only to liquidate beforehand, the damages which the master may be entitled to claim, for a delay occasioned by the default of the merchant. The contract of the master to deliver the cargo, necessarily implies a stipulation to submit to the delay necessary for discharging the ship, in consideration of the freight agreed to be paid. To say that in case of a stipulation to pay demurrage without any lay days being agreed on, the demur-rage would be payable from the moment that the ship arrived at her port of destination and notice thereof, *even during the time necessary for unloading, when no impediment exists, would be to contradict the implied stipulation of the master aforesaid, and to render the terms of the contract inconsistent with each other. The literal meaning of the word demurrage seems to be, a delay occasioned by the default of the merchant. The forms of charter parties, as given in Beawes’ Bex Merc. 134, 135, contain stipulations, (not to pay demurrage for delay, but) to pay for demurrage so much per day.
These consequences, deduced from the nature of the contract, may be controlled at the pleasure of the parties, according to their agreement. Are they controlled or affected bv the stipulations of the parties in this case? The charter party in this case, seems to be nothing more than an abridgment of a charter party in its usual form. I have already noticed, that there is no stipulation for the delivery of the cargo. That is necessarily implied from the nature of the contract, and from its other terms. The engagement of the owners is to take a cargo to Cadiz, without the usual exception of the dangers of the seas. Yet that exception is implied from the nature of the contract, and the owners would not have been responsible for the loss of the cargo, if it had been lost by the perils of the sea. Neither is there a stipulation as usual, that the ship shall be staunch, well manned, and provided. Yet there was an obligation on the owners, that she should be so, implied from the nature of the contract. In the clause concerning demurrage, the usual stipulation to pay demurrage, (“if any shall be by the default of the shipper,’’) is omitted. But, that condition seems to me to be implied from the general agreement to pay demurrage, which is for delay occasioned by the default of the freighter.
But, since the parties may, by express contract, vary the consequences which result from the nature of' the contract, and the merchant might bind himself to pay demurrage, no matter what was the cause of the delay, it may be argued, that the words “quarantine always excepted, provided *it is enforced with such rigor as to prevent vessels from discharging and landing their cargoes during its continuance, and not otherwise, ” found in this charter party, have the effect of excepting this case from the general rule; since it excuses the freighter from paying demurrage in a specified case, in which he would not have been liable under the general rule, and there was no necessity for this exception, unless he was to be liable in all other events. I think this is one of the cases, to which the maxim “expressio eorum quoe tacite insunt nihil operatur” applies, Abbott on Shipping, 242, 243; as the exception of the danger of the seas does not deprive the owner of his right to be exempted from responsibility for the goods if lost by the act of God, as by lightning; Abbott on Shipping, 295, or by pirates, Ibid. 292.
Some of the cases which have led me to this view of the effect of the contract to pay demurrage, are the following: Jamieson &c. v. Laurie, 6 Bro. Parl. Cas. 474, (2d edition.) There the stipulation was to load the ship by an appointed day, and no provision for demurrage. The ship was delayed at the request of the freighter’s agent, and compensation in the nature of demurrage allowed for the delay.
In Stuck v. Tenant, Abbott, 233, the running days for receiving and delivering the cargo were fixed by the charter party at 50 days, with permission to the freighter to keep her a further time upon payment of 51. per day. Upon a suit for twenty days’ demurrage, the defence was, that the freighter, intending to bond and warehouse the goods, had done all that was necessar3' on his part for that purpose, and that the dock company had delayed to land and warehouse them. Held, that the freighter was answerable for the delay, as it would not have happened, if he had thought fit to discharge the duties, instead of giving security for the payment; and the Chief Justice thought that the freighter would have been liable, if the company had improperly refused or delayed to unload the vessel. *1 suppose that by this was meant, that if they could have been landed not otherwise than by the company, the freighter would have been liable for their default; because the company would have been liable over to him for the damages sustained. But, if the failure to unload had proceeded from the act of God, or the government, against which the freighter could have no redress, the case implies that he would have been excused; as a carrier is excused for loss by the act of God, or public enemies, but not by the act of any one responsible for his acts.
So, in a case (stated in Jacobson’s Sea *218 Laws, 250,) of a charter party stipulating for lay days and demurrage, and an action for demurrage, the defence was that the unloading was prevented by ice. The decree was, “that the freighter was liable for the demurrage, unless he could prove that the discharge of the vessel was impossible and of course, upon such proof, he would not be liable.
I have already observed, that the legal effect of a contract simply to carry and receive a cargo, In which either party would be excused from responsibility, if prevented from performing his undertaking by an irresistible necessity against which he could have no redress (as the master, by the destruction of the cargo by tempest or lightning before it was possible to carry and deliver it, or the owner, by the destruction of it before it was possible to receive it,) may be controlled by the contract of the parties. The master may bind himself, at all events, to deliver the cargo safely, and so to insure against all accidents; or the merchant may bind himself, at all events, to unload the vessel in a given time, or to answer for the consequences, if that is not done from any cause. In each particular case, the question whether either party intends so to bind himself, depend upon the particular covenants which he has stipulated to perform.
Thus, in Hadley v. Clarke, the embargo of two years, which prevented the master from carrying the goods, according to his contract during that time, did not make it ^impossible to do it, whenever the embargo was taken off; and an embargo is always, in such cases, considered as a temporary impediment, which both parties are bound to submit to, without either being responsible to the other; b,ut it never dissolves the contract. If the goods had been destroyed without the default of the master, and so that he would have had no remedy over, or if the carrying of the goods had been peremptorily prohibited by the government, the master would not have been responsible.
In the three cases in 3 Taunt. 385, the contract was. that the “goods were to be taken out in twenty days after arrival, or each of the shippers to pay 41. per day demurrage.” The goods were, by law required to be landed at a particular dock; a regulation presumed to be known to the contracting parties, when they fixed upon twenty days, within which the parties stipulated to unload the vessel. The delay in taking out the goods arose, not from accidental and unforeseen causes, but from the nature of the trade. The law required all goods of that description to be landed at a particular place; and so many vessels were there to be unloaded, that the plaintiffs’ vessel could not be unloaded within the twenty days. The hazard of this delay, arising out of a known and usual state of things, was the very hazard contracted for. The hazard of the delay of the first twenty days, the ship-owner took upon himself; and of all beyond that, the shippers took upon themselves. If, after the twenty days, the vessel had foundered in port from a storm, and the goods been lost, although the shippers would have been liable upon this construction of the contract for the demurrage, I incline to think they would no have been liable for the freight.
The case of Paradine v. Jane, cited in Hadley v. Clarke, was this: To an action of debt for rent upon a lease for years, the tenant pleaded, that “Prince Rupert, an alien and enemy, invaded the country with an army, and turned and kept him out of the tenement leased,” &c. The Court decided, that he was, notwithstanding, bound by *his covenant to pay the rent, as he would have been if the land had been surrounded by water. The Judges, in discussing this case, laid down some rules, and stated some cases, by way of exemplifying them; the substance of which was, that when the law creates a duty or charge, and the party is disabled to perform it without any default in him, and has no remedy over, there the law will excuse him; as in case of waste, if a house be destroyed by tempest or enemies. But, when a party, by his own contract, creates a duty or charge upon himself, he is bound to make it good, if he may, notwithstanding any accident by inevitable necessity; as if a tenant covenants to repair, and the house be destroyed by lightning or enemies, he is bound to repair. And it was added, as a reason for the principal judgment, that as the tenant was entitled to the casual profits, he ought to bear the casual loss.
This case, and the principles laid down in it, seem to me to have no bearing upon the case at bar. In all the cases specified, the accident did not make it impossible for the party to do what he contracted to do. The tenant, in the one case, might pay the rent, notwithstanding the invasion of Prince Rupert; and in the other, might rebuild the house, notwithstanding the destruction, by lightning or enemies. But, in the latter case, if the land had been overwhelmed by the sea, or sunk by an earthquake, or condemned for the public use, then the tenant would be prevented by the vis major, from doing the thing contracted for, in any possible way. He could not build, repair or re-build; and the question would be in that case, whether he was responsible for damages for not performing his covenant? I think not; and this is our case.
By a simple contract to carry, I do not think the master of a ship covenants against all accidents, or makes himself answerable for the loss of the goods by shipwreck, a public enemy, or any other unavoidable accident; although there is in his contract no exception of the perils of the sea or any other, as in this case. It becomes impossible, *without his default, to do what he has undertaken. He cannot carry what no longer exists. Nor do I think it can be inferred from a mutual agreement to allow a given time for unloading, that the party covenants to unload at all events, within that time, even if it became impossible to do so, by the state of the elements, or the destruction of the property without the defult of the owner, or by the acts of those who cannot be made responsible to him.
I conclude, therefore, that if it was im *219 possible to unload the vessel before she was lost with the residue of the cargo, the plaintiffs are neither entitled to demurrage nor to freight upon the tobacco lost. But, if the vessel could have been unloaded and discharged within the lay days, or thereafter, before she was lost, and the failure to unload her proceeded from the default of the defendants or their agents, the freight was due from the moment that default incurred ; and demurrage also was due from that time, or from the expiration of the lay days, if the default happened within the lay days. And although it might have been possible to unload the vessel within the lay days, or before she was lost; yet, if the delay in unloading her was with the assent of the master, then the defendants would not have been in default, nor have been answerable, either for freight or demurrage. Volenti non fit injuria. The facts upon which the rights of the plaintiffs, and responsibility of the defendants ■depend, are, whether it was, under existing •circumstances, impossible to unload the vessel or not; if not impossible, at wnat time she might have been unloaded; and if it were possible to unload her, whether the obligation of the defendants to unload her, was waived by the master, and the delay consented to by him: In short, whether the defendants or their agents were in default or not.
If these conclusions are just, then the special verdict does not find sufficient matter to enable us to give judgment upon it either way. It does not find an impossibility to discharge the vessel; but it finds facts upon which an *inference as to that fact, might be made •either way; an inference which it belongs exclusively to a jury to make. It finds facts, from which it might be inferred, that Hackley purposely left the tobacco on board, until he made up his mind what to do with it. It finds facts, from which it might be inferred or not, that the captain consented "to the delay in discharging the cargo: that he not only did not call upon Hackley to ■discharge the cargo, after he was informed he had authority to receive and dispose of the tobacco, but failed to make his protest •against the delay. Whether these circumstances amounted to proof of assent by the captain to the delay, was a matter exclusively for the jury, and would depend upon the custom of merchants and ship-owners, in respect to such protests, and the effect of a failure to protest; which would depend upon evidence as to the custom, to be given to the jury.
These facts are not ascertained by the verdict, which must therefore be set aside, and a new trial awarded.
The PRESIDENT.
The contract on which this action is founded, though not under seal, is in the nature of a charter party. It contains the usual stipulations in such instruments, and subjects the parties to like obligations. The deliver of the cargo at the port of -delivery, is a precedent condition, and must be performed to entitle the plaintiffs to freight, under the contract itself. This obligation on the part of the ship-owners, is implied in the stipulation in the contract to carry the cargo from Richmond in Virginia, to Cadiz in Spain; and by the bills of lading, which are made a part of the special verdict, they expressly engage to deliver the cargo to James C. Wardrop, consignee of the defendants at that port. Hence it is a general principle, that freight is never due, till it is earned by a rightful delivery of the cargo. In an action on the charter party alone, there is no exception to this rule; because, on general principles, *the party who is to perform a precedent condition, must shew that he has performed it, to entitle him to his action, if he relies solely on the contract. If he is prevented from performing it by the acts or omissions of the other party, or by any thing else that will excuse him, the ground of his action is changed, and that ground must be set out in the pleadings. It is so set out in the declaration in this case. The ground is, that the defendants failed in providing, and having ready at the port of delivery, a consignee or agent to receive the cargo; in consequence of which, the vessel was delayed and lost before the cargo could be delivered; and on this ground, and not on the ground that the plaintiffs had performed their contract, must they rely. The special verdict and case agreed, nave application to this case, and no other. If it were a demurrer to evidence, instead of a special verdict, I should incline to the opinion, upon the facts stated in the special verdict, that if there was default any where, it was in the plaintiffs and not in the defendants. I should rather infer from the facts and circumstances stated, that the cargo remained on board with the assent of the master and agent of the consignee, until it was lost. But, on a special verdict, no fact is to be inferred by the Court; and the enquiry is, is the verdict sufficiently certain to found a judgment upon, either for plaintiffs or defendants? My own impression is, that it is not. The gist of the action on the special counts in the declaration is, that the defendants failed in providing and having ready at the port of Cadiz, a consignee to receive the cargo. The findings of the jury which apply to this charge, are, that the master, on his arrival on the 19th of January, 1810, at the port of Cadiz, reported his arrival to Richard S. Hackley, vice consul for the United States at that place, and also agent for the consignee Wardrop as to the flour, but not as to the tobacco part of the cargo; and notified him that he was then and there ready to deliver the cargo, according to the contract: that the said Wardrop, the consignee, was at that time absent from Cadiz at Valentía, and *'so remained until July, 1810; to whom the said Hackley transmitted the letters of the defendants, which had been delivered to him by the master; of which the master had notice: that about ten days from the arrival of the vessel and cargo at Cadiz, the said Hackley did receive instructions from the said Wardrop, relative to the tobacco part of the cargo, and undertook to act as agent of the defendants concerning the same, and gave notice thereof to the master; but gave no directions whatever, *220 at any time, touching that part of the cargo; nor did the master apply for any : that between the 19th day of January, 1810, and the 1st of March following, inclusive, the said Hackley received from on board the vessel, 741 barrels of flour, and paid the freight. So far then, the facts do not support the charge in the declaration to which they apply. In ten days from the arrival of the vessel, the defendants had an agent at the port of delivery, as to the whole cargo, and cannot be said to have failed in providing and having ready, at the port of delivery, a consignee to receive the cargo, in consequence of which, the vessel was delayed and lost; as is charged in the declaration. Ten days were not an unreasonable delay after the arrival of the vessel in another quarter of the globe; and the notice from Hackley, that he was the agent of the consignee after that time, as to the tobacco also, was notice that he was ready to receive it, according to the usage of the port,which is found by the jury; though he gave no directions to the master respecting it. The running days to be paid for in the freight had not expired; ten days of them remained, and the vessel was not lost until the 9th of March following. The delay charged in the declaration refers to the failure to have a consignee ready to receive the cargo, on its arrival at the port of delivery. But suppose it to refer to the time which elapsed after notice to the master that Hackley was agent as to the tobacco part of the cargo. It is expressly found by the jury, that after that notice, the master did not apply for directions as to that part of the cargo; nor is it *found that he made his protest', as is the usage on the failure of the consignee to receive the cargo. To dispense with this, there is no finding of the jury of any readiness on the part of master, to deliver the tobacco; unless the finding of the jury, that between the 19th of January, 1810, and the 1st of March following, Hackley received the flour, is to be considered as sufficient. But, this is too uncertain. If Hackley received the flour, before he was agent for the tobacco, when he informed the master of that fact, it was the duty of the master to give him notice, that he was ready to deliver it also, though he (Hackley,) had given no directions respecting it. The general notice given by the master of his arrival, &c. applied to the flour; as to which, Hackley was their agent, and not to the tobacco, as to which there was no agent at the time. If, on the contrary, the flour was received by Hackley after he was agent for the tobacco, the general notice might be made to apply to both. But, the jury have not so found it; nor can the Court infer the fact either way.
The verdict is uncertain in another respect. If, owing to the state of things found by the jury, at the port of Cadiz, it was impracticable to land the' cargo (according to the usage of the port, which is found by the jury,) it would repel the allegation of delay charged in the declaration, taking it in its broadest sense, and making it apply to the time, after which there was an agent to receive the whole cargo. The finding of the jury, that all the boats and lighters were subject to impressment by the Spanish government: that many of them were impressed; and also that • many vessels remained in the port unloaded; are facts from which it might have been inferred by the jury, in connection with other facts found, that it was either impracticable or not, to land the cargo. But, the verdict has done neither. The finding that it was difficult to procure boats and lighters, and that when procured, they were liable to impressment, is only evidence one way or the other. Upon a demurrer to evidence, .the Court might do it; but not *on a- special verdict. But, there are other facts found by the jury, that leave the mind in some uncertainty as to the cause of delay. The jury find that it was not the intention of the shippers of the cargo to land it at Cadiz, unless a certain price could be gotten for it. • The contract stipulates for twenty lay days, which must be paid for in the freight, and an indefinite demur-rage after the expiration of the lay days at $50 per diem. They might have inferred from these facts, and from the disturbed state of thing at the port, that the cargo-remained on board with the assent of the master and the agent; and if so, there was no default in the agent.
I think, therefore, that the verdict is imperfect in several respects; that it is uncertain as to the fact of notice from the master, that he was ready to deliver the tobacco, after the agent notified him that he was agent as to that part of the cargo; and defective in not finding the fact one way or the other, deducible from the evidence in relation to the practicability of landing the cargo, under the circumstances of the case.
On these grounds, I think the judgment ought to be reversed, the verdict set aside for uncertainty, and a venire de novo awarded.?*